# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **DR. JOHN DOE,** | § | |
| *PLAINTIFF,* | § | |
| | § | **Civil Action No.: _____** |
| **V.** | § | |
| | § | |
| **THE UNIVERSITY OF TEXAS** | § | **TRIAL BY JURY DEMANDED** |
| **HEALTH SCIENCE CENTER** | § | |
| **AT HOUSTON, ET AL.,** | § | |
| *DEFENDANTS.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND APPLICATION FOR INJUNCTIVE RELIEF

**TO THE HONORABLE COURT:**

COMES NOW Dr. John Doe, Plaintiff, and files this Original Complaint against The University of Texas Health Science Center at Houston, Dr. Margaret McNeese in her individual capacity, Dr. Sheela Lahoti in her individual capacity, Deana Moylan in her individual capacity, and Tiffany Obeng in her individual capacity, all Defendants, and files this Application for Injunctive Relief. This action arises from Defendant The University of Texas Health Science Center at Houston's violation of Plaintiff's rights under Title IX of the Education Amendments of 1972, 20 U.S.C. sections 1681 to 1688. In support of Plaintiff Dr. John Doe's Complaint, he respectfully submits the following:

## A. PARTIES

1.      Plaintiff is Dr. John Doe (hereinafter "Dr. Doe" or "Plaintiff"). Plaintiff is a citizen of the State of Texas. Plaintiff may be served by and through his attorney of record: Susan H. Soto, Susan Soto Law, PLLC, P.O. Box 571, Missouri City, TX 77459.  A court may permit a plaintiff to proceed anonymously to protect the plaintiff's privacy or safety. *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992). Dr. Doe files this suit under a pseudonym because this litigation involves matters that are highly sensitive and of a personal nature. *Doe v. Public Citizen*, 749 F. 3d 246, 273 (4th Cir. 2014). Identification of Dr. Doe presents other harms as well and the likely severity of those harms is grave. *Sealed Plaintiff v. Sealed Defendant #1*, 537 F.3d 185, 189-90 (2d Cir. 2008). As a result of Defendants' actions, Dr. Doe has already lost the opportunity to match with a residency program for one match cycle; should he be identified in this lawsuit, the risk is likely and high that his name becoming public would cause him to not match with a residency program again.

2.      Defendant The University of Texas Health Science Center at Houston (hereinafter "UTHSCH" or "the school") is a governmental entity, doing business in the State of Texas, with its principal place of business in Houston, Texas. Defendant may be served by and through Vice President and

Chief Legal Officer Melissa Pifko, The University of Texas Health Science Center at Houston, Office of Legal Affairs, 7000 Fannin Street, Houston, Texas 77030.

3.     Defendant Dr. Margaret McNeese, an individual, a citizen of the State of Texas, an employee of The University of Texas Health Science Center at Houston and sued in her individual capacity, may be served with process at 2719 Ferndale Street, Houston, Texas 77098.

4.     Defendant Dr. Sheela Lahoti, an individual, a citizen of the State of Texas, an employee of The University of Texas Health Science Center at Houston and sued in her individual capacity, may be served with process at 6622 Sewanee, Houston, Texas 77005.

5.     Defendant Deana Moylan, an individual, a citizen of the State of Texas, an employee of The University of Texas Health Science Center at Houston and sued in her individual capacity, may be served with process at 4018 Balsam Fir Lane, Spring, Texas 77386.

6.     Defendant Tiffany Obeng, an individual, a citizen of the State of Texas, an employee of The University of Texas Health Science Center at Houston and sued in her individual capacity, may be served with process at 5506 Pecan Hollow Drive, Missouri City, Texas 77459.

**B. Jurisdiction & Venue**

7.     This Court has jurisdiction over the lawsuit because the action arises under Title IX of the Education Amendments of 1972, 209 U.S.C. sections 1681 to 1688. Defendant The University of Texas Health Science Center at Houston violated Plaintiff's rights by violating Title IX and discriminating against Dr. Doe on the basis of sex.

8.     Venue is proper in this Judicial District under 28 U.S.C. § 1391 because Defendant The University of Texas Health Science Center at Houston was doing business in Harris County, Texas at the time of the incidents that form the basis of this lawsuit and a substantial part of the acts and omissions giving rise to Dr. Doe's claims occurred in this Judicial District.

9.     While not required under Title IX, Plaintiff exhausted his administrative remedies through the school's administrative process. In those proceedings, Plaintiff raised the Title IX sex discrimination claims and retaliation claims he now raises in this Complaint.

**C. Conditions Precedent**

10.     All conditions precedent have been performed or have occurred.

**D. Facts**

11.     Dr. Doe began his medical education at the school in 2015. Samuel Leonard, a classmate at UTHSCH, took an inappropriate interest in

Dr. Doe that was not reciprocated by Dr. Doe. Samuel Leonard ("Leonard"),

over the course of several semesters between 2016 and 2019, sexually

harassed and bullied Dr. Doe, creating a hostile educational environment for

the Plaintiff. Leonard made unwelcome physical contact with Dr. Doe,

verbally bullied him, and made a request of Dr. Doe for oral sex. Dr. Doe

complained to Defendant UTHSCH's Office of Admissions and Student

Affairs ("OASA") about Leonard's abusive treatment, but OASA did not

open an investigation, even after Dr. Doe provided evidence of the

harassment and abuse.

   12.    Instead, OASA put <u>Dr. Doe</u> before the school's Student

Evaluation and Promotions Committee[1] ("SEPC") in March 2017 because

Leonard alerted OASA that some time previously, Dr. Doe had helped

himself to some almonds that were set out in an office. Leonard craftily used

this report as a self-serving diversionary tactic, even though the snack took

place more than six months prior to Leonard making the report to OASA.

   13.    After the March 2017 SEPC meeting where Dr. Doe's

professionalism was examined and discussed as it related to the almond

snack, Dr. Doe was so upset by the unfairness of the process that he was

---

[1] Student Evaluation and Promotions Committees are common in medical schools. They consider students' petitions, review the academic performance or professional comportment of students, or meet for other purposes as determined by the institution.

unable to focus on studying for a major Board Exam. To regain his focus and to get back on track, Dr. Doe took the fall 2017 semester off from school. Sadly, OASA continued to ignore Dr. Doe's complaints about Leonard, whose harassing behavior towards Dr. Doe continued during Dr. Doe's gap semester.

14.    Dr. Doe was on good terms with OASA staff throughout 2018 and until March 2019, at which time Dr. Doe emphatically and specifically made a Title IX complaint about Samuel Leonard to Nicole Dubuque ("Dubuque"). The afternoon following Dr. Doe's repeated outcry, Dubuque telephoned Dr. Doe two times in order to summon him to a meeting with Defendant Dr. Margaret McNeese ("McNeese"), the school's Vice Dean for Admissions and Student Affairs and the school's Title IX coordinator, and Defendant Dr. Sheela Lahoti ("Lahoti"), Associate Dean for Admissions and Student Affairs. Dubuque and Dr. Doe both informed McNeese and Lahoti about Dr. Doe's complaint, but still no Title IX investigation was initiated. Instead, McNeese told Dr. Doe that Leonard had already faced consequences for his abhorrent behavior and advised that Dr. Doe should not worry about

the inclusion of the March 2017 SEPC meeting on Dr. Doe's MSPE letter[2] because "no adverse action had been taken" against Dr. Doe.

15.     Strangely, McNeese called the University of Texas Police at Houston Department ("UTPHD") more than 24 hours after Dr. Doe's meeting with Nicole Dubuque. Dubuque reported to UTPHD Sergeant Brodie Riner that she had allegedly felt "threatened" during her conversation with Dr. Doe. In turn, UTPHD spoke with Dr. Doe and informed him of the report. The school's police department did not take any further action and Dr. Doe followed up with Dubuque. He specifically asked her if she "felt threatened" during their previous meeting. She responded that she felt "uncomfortable," but she would not say that she felt "threatened." Again, no Title IX investigation was initiated, nor were SEPC proceedings initiated in order to review Dr. Doe's recent conduct, which, if one believes the report made to UTPHD, was offensive enough to make Dubuque "uncomfortable" or "threatened." Under normal circumstances, would conduct of this nature not be unprofessional enough to warrant an SEPC referral? One would think so.

---

[2] The MSPE is a summary letter of evaluation that provides residency programs with a summary of a medical student's experiences, attributes, and academic performance.

16.    <u>Months</u> later, in early November 2019, Dr. Doe was made aware of a complaint written by Dubuque, purportedly written in March. However, Yolanda Bell ("Bell"), a member of OASA staff, told Dr. Doe that the written complaint statement was not written until May, after Dr. Doe's second Title IX complaint. Bell also stated that Defendants McNeese and Lahoti had instructed OASA staff to provide statements against Dr. Doe after Dr. Doe filed a Title IX complaint. Interestingly, Dubuque does not specify in her complaint what her conversation with Dr. Doe was about, nor does she reveal what Dr. Doe said that made her "feel threatened."

17.    On March 12, 2019, Dr. Doe spoke with Devan Santora ("Santora"), the Executive Services Administrator in the Dean's office, to request a meeting with Dean Barbara Stoll. Dr. Doe outlined his Title IX complaint and concerns about OASA for Santora, who said she would talk to her "good friend" Dubuque about them before figuring out a way forward. Santora and Dr. Doe met in Santora's office for approximately one hour, with the office door closed for privacy. Then, in another shocking turn of events, after Santora communicated with Dubuque, she <u>also</u> called the UTPHD and claimed that she felt "uncomfortable" during her conversation with Dr. Doe, because he asked her to close the door to the office so that they could speak privately. Santora's report to police was also made more

than twenty-four hours after her meeting with Dr. Doe, indicating that Santora, like Dubuque, did not feel "uncomfortable" enough to create a sense of urgency to report to law enforcement officials. Santora never did arrange a meeting between Dr. Doe and Dean Stoll.

18.     Dr. Doe filed several complaints about OASA with the UTHSCH Office of Institutional Compliance ("OIC") in April 2019. Dr. Doe held off on re-urging his Title IX complaint to the OIC because he did not feel comfortable sharing the details with them, which were embarrassingly sexual in nature. Dr. Doe wanted to wait and see how the OIC dealt with his other complaints before re-urging his Title IX complaint. The OIC encouraged Dr. Doe to speak with Dean Stoll.

19.     Dr. Doe did not experience any negative consequences as a result of his complaints in April 2019, when he first filed his complaints against OASA with the OIC. No educational services or resources were restricted from him in April 2019; OASA did not restrict him from benefiting from services or resources to which other students had access until after his Title IX complaint was filed.

20.     Upon the advice of OIC, Dr. Doe requested a meeting with Dean Stoll via email through Dean Stoll's assistant, Devan Santora, on May 6, 2019. Initially, Dr. Doe did not get a response, but after OIC's

Compliance Coordinator, Stephen Arong ("Arong"), called Santora and told her to respond to Dr. Doe, she begrudgingly set up a short meeting between the Dean and Dr. Doe for later in the month.

21.     On May 7, 2019, Dr. Doe filed an additional complaint with OIC, reporting his fear that OASA would try to retaliate against him on his Medical Student Performance Evaluation ("MSPE") letter. Dr. Doe also filed a complaint that Defendant McNeese, Defendant Lahoti, Dr. Dana McDowelle and other OASA staff had started to treat him differently than other students were treated and to disparage his national origin by intentionally mispronouncing his name. In fact, McNeese, Lahoti and McDowelle admitted their bad acts to Deana Moylan, who was investigating this particular claim and were put on notice by Title IX administrators to refrain from the antagonistic and inappropriate treatment. Their response? They emailed Dr. Doe and intentionally misspelled his name in the correspondence.

22.     On May 22, 2019, when Dr. Doe was scheduled to meet with Dean Stoll, Defendant McNeese and the UTPHD also appeared at the meeting, without any prior notice to Dr. Doe. Even though complaints were already filed through OIC against McNeese's office at this point, McNeese did not recuse herself from the meeting. Dr. Doe respectfully asked that

McNeese not be present in the meeting and suggested that the meeting would otherwise be discontinued. In response, Dean Stoll asked McNeese to leave and called OASA staff member Yolanda Bell into the meeting instead. The police recorded the meeting with Dean Stoll. After the meeting, Dean Stoll initiated an official Title IX investigation.

23.     Dean Stoll ignored all subsequent communication from Dr. Doe after that meeting, but she did act behind the scenes on October 1, 2019 to prevent OASA from altering the wording of Dr. Doe's MSPE letter at that time. She also stepped in to prevent the SEPC from dismissing Dr. Doe from medical school in December 2019.

24.     On July 2, 2019, Dubuque clarified for Dr. Doe that Defendant McNeese had not recused herself from meeting with Dr. Doe about his MSPE, and suggested that since the MSPE would not be written until September, he could meet with McNeese to review the letter after it was written.

25.     On July 9, 2019, Dr. Doe provided a written complaint about Leonard's propositioning him to Defendant Deana Moylan ("Moylan"), the ranking administrator over Diversity and Equal Opportunity. Defendant Moylan delegated the case downward, so Dr. Doe met with Defendant Tiffany Obeng ("Obeng"), Senior Equal Opportunity Advisor, on July 12,

2019. Defendant Obeng initially refused to meet with Dr. Doe without Sgt.
Riner present, as she had been advised by Defendant McNeese to have
UTPD present. Complainants generally do not require a police presence
when meeting with a Title IX investigator, so this is another example of
disparate treatment and was an attempt to further intimidate Dr. Doe. Dr.
Doe refused to meet with Obeng if UTPHD was invited, at which point
Obeng relented and met alone with Dr. Doe. Obeng made a number of
comments during the meeting that downplayed Dr. Doe's feelings about
Leonard's actions and how they affected Dr. Doe and his educational
environment. Moylan, in washing her hands of Dr. Doe's Title IX complaint,
neglected her responsibilities and violated her duties as the school's Deputy
Title IX Coordinator. She never investigated Dr. Doe's complaint.

26.    On July 26, 2019, Defendant McNeese recused herself from the
Title IX investigation, but then continued to act in her role as Vice Dean
when she withheld educational services from Dr. Doe. McNeese directed Dr.
Doe to speak exclusively with Dr. Wallace Gleason regarding all educational
matters, instead of with her, because of the active OIC and Title IX
investigations. Dr. Gleason shared with Dr. Doe that he directly mentored
Leonard and that he generally did not provide advice to fourth-year medical
students. Defendant McNeese was aware of these facts and nevertheless

made the inappropriate decision that had the potential to seriously damage

Dr. Doe's educational career – to push him off on someone else rather than

treat him like every other student and provide to him the benefit of OASA

services and programs.

27.     Dr. Doe filed a series of retaliation complaints against OASA

for various reasons after the Title IX investigation was initiated. *See* para.

18, supra. For example, OASA staff member Denise Pinales said that she is

an "equal opportunity liar" and lies to all students the same way she did to

Dr. Doe when she denied him a meeting with Yolanda Bell; Dubuque

entirely refused to review Dr. Doe's Personal Statement (which she normally

does for senior medical students as part of her job responsibilities).

28.     On July 29, 2019, Defendants McNeese and Lahoti solicited

statements against Dr. Doe from OASA staff, which amounted to nothing

more than some staffers (not all) reporting that they felt uncomfortable

around Dr. Doe, and presented the statements to UTPHD and to Dean Stoll.

To this day, the false and self-serving statements have not been substantiated

with any supportive evidence or corroboration. Dr. Doe was never asked to

provide a statement, nor was he permitted to be present when the statements

were provided to the Dean. Suspiciously, the statements and allegations

against Dr. Doe were not provided to OIC and were not provided to Dr. Doe

until _after_ the Title IX investigation closed at the end of October 2019. They were provided to UTPHD on July 29, 2019, but the police did not consider Dr. Doe to be a threat in any way and so did not take any action. However, against the advice of UTPHD, McNeese and Lahoti insisted that they wanted police presence in the OASA office from that point forward. From then on, a UTPHD officer was regularly posted in the OASA office until Dr. Doe left for his "away rotation" in mid-August 2019. Dr. Doe did not directly interact with anyone in OASA during this time period and communicated only with Dr. Wallace Gleason. The police officer assigned to OASA, however, followed Dr. Doe around campus and discouraged Dr. Doe through intimidation from congregating with other medical students in the student lounge area near the OASA office whenever Dr. Doe was on campus.

29.   For some reason, out of the blue on July 29, 2019, OIC sent Dr. Doe an email that contains the process of withdrawing a complaint, in case he wanted to withdraw his complaints at that time. He did not. Instead, on July 31, 2019, Dr. Doe submitted a signed statement regarding his Title IX complaint to Defendants Tiffany Obeng and Deana Moylan.

30.   On September 3, 2019, Defendant McNeese sent out a general email asserting that the school is committed to preventing Title IX incidents from occurring. The timing of this email is suspect.

31.     On September 6, 2019, Defendant Moylan notified Dr. Doe that she had some questions for him, but he was on an "away rotation" in Rochester, New York at that time and was unable to meet with her. Moylan was unwilling to email her questions to Dr. Doe or to pose them over the telephone. Defendant Moylan <u>never</u> asked Dr. Doe any questions before she closed the Title IX case on October 29, 2019. This is a breach of her duties and responsibilities under federal law.

32.     Dr. Doe reported to OIC's Arong on September 12, 2019 that Moylan refused to accommodate Dr. Doe being out of town on a rotation; Arong's only suggestion in a responsive email was for Dr. Doe to withdraw his Title IX complaint if he so chooses. Dr. Doe responded that he would not be bullied into withdrawing his Title IX complaint.

33.     Also on September 12, 2019, Arong provided a document to Dr. Doe that states that best practices were not followed during the first SEPC meeting concerning Dr. Doe, held in March 2017. *See* para. 12, *supra*. Arong told Dr. Doe that it is clear from the document that there should be some changes to the SEPC process in order to align the process with standing Board of Regents rules and university policy.

34.     On September 16, 2019, the UTHSCH Office of Legal Affairs declined to talk to Dr. Doe because it represents OASA and the institution.

However, the Office of Legal Affairs had been advising OASA the whole time relevant to this lawsuit <u>and</u> is a part of the school's Title IX committee. While Defendant McNeese had purportedly recused herself from the Title IX process, her attorneys remained on the Title IX committee and were involved in the Title IX investigation into Leonard's actions. The Office of Legal Affairs is also a participant in the committee that reviews information gathered in OIC investigations and decides the final outcome of those investigations. It is impossible to have had impartial investigation into OASA's actions against Dr. Doe when OASA's legal representative was a part of the two bodies responsible for information review and decision outcome! If neither Dr. Doe nor his attorney were permitted to sit in on what Defendant UTHSCH calls "triage teams" regarding complaints, then why was OASA's attorney permitted to do so? This is a scandalous and egregious violation of Dr. Doe's civil rights.

35.     By September 24, 2019, most UTHSCH students received an email notifying them that they were now able to review their MSPE letters, so Dr. Doe emailed Dr. Gleason in order to review his letter. Dr. Gleason replied that the letter was not ready yet and suggested that he is not responsible for writing it, anyway. It was OASA's Dr. Dana McDowelle ("McDowelle") who emailed Dr. Doe and said the letter was ready to

review.  Upon review, it was evident to Dr. Doe that the Professionalism section (regarding the March 2017 SEPC meeting) had been written in a manner more damaging than what OASA had either originally intended or led Dr. Doe to believe. Dr. Gleason said that the wording had been approved by McNeese, Lahoti and McDowelle. Dr. Doe reported his concern about the MSPE letter to OIC, Dean Stoll, and others. There exists an email string where Defendant McNeese alleges that both Dr. Doe and UTPHD are lying about how OASA intended to word the MSPE letter. Dean Stoll stepped in and stopped OASA from inappropriately wording the MSPE letter. *See* para. 23, *supra*.

36.    On October 1, 2019, an MSPE for Dr. Doe was released by the OASA office that does not have any indication that Dr. Doe committed any breaches of professionalism in 2019. Under National Resident Matching Program rules, the MSPE letter is required to be honest and complete. If Dr. Doe behaved in the manner in which the sham statements solicited by Defendants McNeese and Lahoti accuse him of behaving, why did OASA not say so in that important document? They did not say that Dr. Doe was unprofessional because he had not been unprofessional!

37.     On October 24, 2019, Dr. Doe was invited to review the findings of the Title IX investigation. The Title IX meeting was held on October 29, 2019.

38.     During that October 29 meeting, Defendant Deana Moylan shared a summary with Dr. Doe that misrepresents Dr. Doe's statements and intentionally excludes facts and statements that support Dr. Doe's allegations against Leonard. In addition, the summary document says that Dr. Doe was unable to be reached in order for the investigation to be completed, which is untrue. The document also mischaracterizes a statement by key witness Kevin Cornell regarding Leonard's sexual harassment of Dr. Doe. Defendant Moylan concluded the meeting by stating that she believed that Dr. Doe's sentiment that the Title IX office and the school were sweeping Dr. Doe's concerns "under the rug" were "unprofessional" and "inappropriate."

39.     Immediately after the meeting with Defendant Moylan, OASA initiated another SEPC meeting process to discuss Dr. Doe's alleged "unprofessionalism." Per documentation provided by OASA, the SEPC convened on November 5, 2019 and made the decision that Dr. Doe had behaved unprofessionally – before hearing Dr. Doe's side of the story and before allowing Dr. Doe to rebut any of the accusations made by OASA.

The SEPC was provided with the series of unidentified, undated, heavily redacted, contradictory statements that had been solicited by Defendants McNeese and Lahoti from their staff in the OASA office, which were still lacking supportive evidence. Some of the allegations are back-dated between March and August 2019, but the matter was not brought to the attention of the SEPC until November 5, 2019 (one week after the Title IX investigation closing meeting). Why? It normally takes only one week for OASA to initiate an SEPC hearing; SEPC chairman Dr. Michael Redwine found it very odd that an SEPC meeting had not been convened months earlier if the allegations existed months earlier. Dr. Doe was concerned that the SEPC meeting was held in retaliation, so he filed another complaint with OIC.

40.     Dr. Doe had reported some of the incidents mentioned in the packet of allegations from OASA that SEPC reviewed to the Office of Institutional Compliance in a timely manner/as they occurred. The OIC questioned OASA about these incidents, yet OASA never provided the packet of allegations/statements to OIC during the course of OIC's various investigations. Stephen Arong stated on multiple occasions that OASA felt very uncomfortable with Arong's line of questioning about the incidents of which Dr. Doe complained. Sergeant Riner also commented to Dr. Doe, on at least two occasions, that Dr. Doe had "OIC and EEO so far up OASA's

butts that they obviously are unhappy with you [Doe]." Despite OASA's and SEPC's actions, Dr. Doe continued to act professionally and attempted to set up a mediation to resolve the matter. Defendant McNeese denied that request.

41.     Stephen Arong and William Lemaistre, the University's Vice President and Chief Compliance Officer, both told Dr. Doe on audio recording that the recent OASA and SEPC situation has a strong appearance of retaliation. Worse, Yolanda Bell told Dr. Doe that the allegation statements were solicited by Defendants McNeese and Lahoti in May, after Dr. Doe filed the Title IX complaint against Samuel Leonard, and then were back-dated. The SEPC was not told when the allegations had been solicited or written; the dates and names were redacted in the packets that were shared with the committee members. Yolanda Bell asked Dr. Doe directly how he thought the Title IX coordinator (Defendant McNeese) felt when he alleged that McNeese's office ignored his Title IX complaint for years, linking McNeese's actions to what Dr. Doe said when exercising his First Amendment rights.

42.     After Dr. Doe made his Title IX complaint, he was subjected to increased scrutiny. There was an allegation that he lied on his 2013 Joint Admissions Medical Program ("JAMP") application regarding his address,

which is easily refuted. Notably, no other JAMP student was questioned
about his/her address updates on JAMP applications or put before SEPC for
being suspected of being dishonest on a JAMP application.

43.     After OASA submitted the solicited, self-serving accusations
against Dr. Doe to SEPC, Dr. Redwine agreed to postpone the SEPC
meeting until after January 15, 2020, as Dr. Doe was scheduled for another
"away rotation" in Florida, and then was to be on vacation. The Office of
Admissions and Student Affairs disregarded Dr. Redwine's decision and
sent an email to Dr. Doe informing him that SEPC had decided that the
meeting should happen as soon as possible. When Dr. Doe requested the
SEPC meeting minutes regarding this decision (since it was contrary to what
Dr. Redwine told him), they did not provide any meeting minutes to verify
that this was an SEPC decision. Normally, OASA determines when SEPC
meetings are held, so by representing to Dr. Doe that it was SEPC's decision
to hurry the process along, OASA inadvertently provided evidence that
OASA uses SEPC as a puppet in a sham process. Invading the province of
SEPC's authority, OASA told Dr. Doe that he would be dismissed if a
breach in professionalism were to be found.

44.     On December 9, 2019, Dr. Doe reached out to UT Regent John
Zerwas to complain about SEPC and share with him an audio recording of

Stephen Arong saying that the process has a strong appearance of retaliation.

Mr. Zerwas said he is not involved in UTHSCH's processes, but he spoke

with Dr. Michael Blackburn (Executive Vice President & Chief Academic

Officer) and forwarded Dr. Doe's concerns to him. Also on December 9, Dr.

Doe was informed that he was no longer allowed to talk to Arong. All

communication was to go directly to Arong's boss, William Lemaistre.

45.     On December 18, 2019, the SEPC meeting was held and Dr.

Doe was treated differently than other students who go before the

committee. First, the complainant was OASA and they were also members

of the committee. Second, Dr. Doe did not get to hear witness testimony or

cross examine witnesses. Third, the meeting was held in a different part of

the school, while the meetings are usually held in the OASA office. The

location of the meeting was not provided to Dr. Doe until the night before

the meeting in an aggressive move to assert power over Dr. Doe and to

intimidate him, even though every other student called before SEPC knows

the location at least one week prior to the meeting. Fourth, OASA made the

decision to deny Dr. Doe his right to have his attorney present in the room

and this decision was only conveyed to Dr. Doe after business hours the

night prior to and then again the morning of the SEPC meeting. This

decision contradicts Dr. Redwine's statement just two days prior to the

SEPC meeting, where he clearly stipulated that the attorney could be a "potted plant" in the room. Fifth, OASA asked UTPHD to be present outside the meeting room in a continued effort to intimidate Dr. Doe; police are not present or on duty outside of other students' SEPC meetings.

46.     During the SEPC meeting, Dr. Aleksandra De Golovine, a colleague of Lahoti's husband, directed much of the conversation and said at one point that the persons who provided statements "are scared women." This is an example of how, because Dr. Doe is a man, he was perceived and treated differently than other students. Yolanda Bell (OASA staff member) served as the meeting minutes recorder and was not supposed to speak during the meeting, but she interrupted the meeting to counter what Dr. Doe said. Dr. Doe was not given an opportunity to know the names of most of his accusers, much less directly address them, making it difficult to respond to the vague, secret accusations. The name of the person who allegedly proposed that an addendum be added to the MSPE letter is missing from the meeting minutes; it is on Plaintiff's information and belief that OASA independently added the decision to add an addendum to Dr. Doe's MSPE letter and that it was not proposed by a member of the SEPC committee. Unless intimately aware of OASA processes and the MSPE, it is unlikely that the SEPC would have proposed such a consequence for Dr. Doe,

especially if they did not find him to have breached any of the school's policies. There was no discussion of adding an addendum to Dr. Doe's MSPE while he was in the room for the meeting, nor was there discussion about the possibility of him being dismissed from the program. In fact, in a post-SEPC telephone call with Dr. Doe, Dr. Redwine said SEPC looked upon Dr. Doe "very favorably" and that, to his knowledge, "there was no adverse action taken." Dr. Redwine said at the end of the SEPC meeting that Dr. Doe would "receive a decision letter in the next couple days and it'll say it's from me but I don't write it." Dr. Redwine confirmed in the post-SEPC phone call that Defendant McNeese, Defendant Lahoti and Yolanda Bell – all with OASA – wrote the SEPC decision letter and sent it to Dr. Doe, and also uploaded the addendum to the MSPE letter; the wording of neither was approved by SEPC, yet the SEPC meeting minutes are required to be approved by SEPC. This is further evidence that OASA uses SEPC as a puppet in a sham process and used it here to retaliate against Dr. Doe. Two days prior to the SEPC meeting, Dr. Doe discussed with Dr. Redwine that even if SEPC looked upon him favorably, OASA would still decide to add an addendum to the MSPE letter. Dr. Redwine said on audio recording, "What letter? What are you talking about?" Dr. Redwine was of the belief that if SEPC did not decide to dismiss Dr. Doe, then there would be no

addendum needed. The fact that the SEPC committee members were not informed of the possible consequences of their decision also shows manipulation of the process by the OASA office.

47.     Dr. Doe had applied to both ophthalmology and anesthesiology residency positions. Ophthalmology residency positions are applied to through *SFMatch* and anesthesiology residency positions are applied to through *ERAS*. The SEPC meeting minutes for December 18, 2019 somehow ended up showing that an addendum (unfavorable and not even determined by the SEPC) should be added to Dr. Doe's MSPE letter for the *ERAS* "Main Residency Match," so an addendum was quickly added on December 18, 2019 to Dr. Doe's *ERAS* "Main Residency Match" application for anesthesia. Dr. Doe immediately appealed the SEPC decision to Dr. Guiseppe Colasurdo, the president of the institution. In other students' cases, OASA has waited until the outcome of an appeal before taking any sort of action regarding an MSPE letter or adding an addendum to same. Here, an addendum was added to Dr. Doe's *SFMatch* application on January 3, 2020, prior to the Office of the President issuing a decision on the appeal. It appears that OASA overlooked the fact that Dr. Doe had applied to ophthalmology residency positions and was only reminded of it when Dr. Doe explicitly stated it in his appeal to the president.

48.     On Friday, January 3, 2020, Dr. Doe learned that OASA added an addendum to the *SFMatch* ophthalmology application in spite of the fact that the SEPC decision letter had only directed OASA to alter the letter in the *ERAS* system and that no determination had been made with respect to the appeal. Dr. Doe reached out to the president's office and requested an urgent meeting to discuss his appeal, to which the president agreed. During the meeting, the president explicitly stated that he feels that OASA is best equipped to handle these situations and he did not want to discuss the matter in any amount of detail. He asked Dr. Doe about his background and aspirations and then concluded the meeting. On January 6, 2020, the president's office released a document that states, "no adverse action was taken" against Dr. Doe, but that an addendum should be added to *SFMatch*, as well. The OASA had already done that the Friday <u>before</u> the meeting with and decision of the president.

49.     Dr. Doe spoke with Dr. Eugene Boisaubin, an ethics professor at UTHSCH, after the SEPC meeting and he revealed that "Dean Stoll and higher-ups" at the university had stepped in prior to the SEPC meeting and told Dr. Redwine that Dr. Doe was not to be dismissed after an internal memo had been distributed by the Office of Institutional Compliance that the meeting had a "strong appearance of retaliation."

50.     On January 15, 2020, Dr. Doe learned that he did not match with a residency program. He communicated with the president's office and again asked that the retaliatory addendum be removed from his MSPE letter. Dr. Doe also met with Defendant UTHSCH Chief Academic Officer Michael Blackburn and asked him to remove the retaliatory addendum from the MSPE letter. As had become the custom and practice of Defendant UTHSCH, Dr. Blackburn's assistant called UTPHD to report that Dr. Doe was behaving unprofessionally during his meeting with Dr. Blackburn. When Sgt. Riner followed up with Dr. Doe regarding the allegation, Dr. Doe told him it was a false report; when Sgt. Riner followed up with Dr. Blackburn regarding the allegation, Dr. Blackburn said that while Dr. Doe was tearful and upset during the meeting, he HAD NOT been loud or unprofessional.

51.     At least one residency program director verified that Dr. Doe would have matched to their respective program, but when the last-minute addendum was received, they removed Dr. Doe from their rank list.

52.     On January 16, 2020, all investigations conducted by OIC were closed and none of them are in Dr. Doe's favor. Neither Defendant McNeese, Defendant Lahoti, or OASA reached out to Dr. Doe after he did not match, even though that has been the standard procedure with all other

students in previous years. Either Lahoti or other OASA staff normally contacts unmatched applicants, as was the case for Dr. John Hunt, who did not match ophthalmology in the previous cycle. For Dr. Doe, the disparate treatment continued; Yolanda Bell told him that it was best for them to meet outside of OASA and that he should not go in to the OASA office, because Defendants McNeese and Lahoti were unhappy that Dr. Doe had not been dismissed from the program. Further, Dr. Mark Farnie, an Internal Medicine professor at UTHSCH, found it extremely odd and unfair that OASA did not reach out to Dr. Doe after he did not match for an ophthalmology residency.

53.     Shortly thereafter, Dr. Jeffrey Actor forwarded an email to Dr. Doe to let Dr. Doe know that he thinks it is interesting that all faculty and staff are now having to undergo mandatory Title IX reporting training. The timing of this training is suspect.

54. Still focused on retaliating against Dr. Doe, Defendant Lahoti took it upon herself to reach out to Dr. Rahul Pundit in Dr. Andrew G. Lee's ophthalmology office and discuss Dr. Doe's educational record – unsolicited and in violation of FERPA. Lahoti then tried to entrap Dr. Doe by requesting pictures and statements from him, through Drs. Pundit and Lee, of a "car accident" – which was an analogy that Dr. Doe had used to describe the whole situation with Defendant UTHSCH. There was no reason for Lahoti

to reach out to Dr. Pundit or Dr. Lee. Dr. Lee knew this and informed Dr. Doe of same on February 4, 2020. When Dr. Doe discussed this latest development with Sgt. Riner of UTPHD, his response to Dr. Doe was, "All of this has become personal for Student Affairs. It's so obvious."

55.    It was also inappropriate for Lahoti to continue her campaign against Dr. Doe because he chose to withhold his directory information, meaning that the school could no longer confirm that he was a student at the institution to third parties, much less discuss his educational record with people like Dr. Pundit and Dr. Lee. Defendants McNeese and Lahoti only discontinued their campaign after Dr. Doe reached out to the president's office to tell them about Defendant Lahoti's highly inappropriate phone call to, and request of, Dr. Pundit and Dr. Lee.

56.    When Dr. Doe requested a Verification of Enrollment Letter from OASA because he needed it for another rotation to which he was applying, the letter he was provided is very different than what is provided to other students. Dr. Doe's letter basically urges programs to ask OASA for the damaging MSPE letter.

57.    On March 3, 2020, Dean Stoll sent out an email reminding the school community that she takes student mistreatment very seriously. The timing of this email is suspect. On March 11, 2020, Dr. Doe learned that

Dean Stoll created a new Office of Professionalism that reports directly to
her office, rather than to OASA, as one of her last acts as Dean – she
announced her retirement on May 4, 2020.

58.     Dr. Doe graduated on May 1, 2020.

59.     Since graduation, Vice President of Institutional Compliance
William Lemaistre is no longer in his position at the school. He made no
secret of the fact that he felt terrible about what happened to Dr. Doe and
commented to Dr. Doe that it made no sense for OASA to pursue complaints
against Dr. Doe so far after the fact. His question to Dr. Doe was, "Why
now?" which begets the inference that there is no legitimate reason for
OASA's implementation of a SEPC meeting regarding Dr. Doe in fall 2019,
only a retaliatory reason.

### E.  CAUSES OF ACTION

**COUNT 1 Sex Discrimination Pursuant to Title IX of the Education
Amendments of 1972, Ch. 39, 86 Stat. 235, 20 U.S.C. §§ 1681 *et seq*. and
Pursuant to the Civil Rights Restoration Act of 1987,
102 Stat. 29, § 1687**

AS AGAINST DEFENDANT THE UNIVERSITY OF TEXAS HEALTH
SCIENCE CENTER AT HOUSTON:

60. Plaintiff re-alleges and incorporates by reference the allegations set
forth in paragraphs 11-59, above, as if fully set forth herein. Defendant
UTHSCH intentionally, willfully and without justification acted to deprive

Dr. Doe on the grounds of his sex of his rights, privileges and immunities secured by the laws of the United States, particularly his right to be free from discrimination in education on the grounds of his sex as provided by Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*.

61. The Defendant, despite knowledge and adequate opportunity to learn of the misconduct of its agents and employees, adopted, approved, and ratified these acts, omissions, and misconduct.

62. Defendant's unlawful acts have caused Plaintiff economic damages in the form of income, benefits, and consequential damages in an amount to be proved at trial.

63. Defendant's unlawful acts have caused Plaintiff non-economic damages in the form of physical illness, injury to reputation, personal humiliation, and mental anguish and suffering, to be proved at trial.

64. Plaintiff is entitled to costs, disbursements, and reasonable attorney's fees incurred.

### <u>COUNT 2</u> Title IX, 42 U.S.C. § 2000E-3(a) Retaliation for Engaging in Protected Activity

AS AGAINST DEFENDANT THE UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER AT HOUSTON:

65. Plaintiff realleges all matters set forth in paragraphs 11-59 and incorporates them herein.

66.     Dr. Doe participated in protected activity when he complained about discrimination and harassment based on sex.

67.     Dr. Doe also participated in protected activity when he complained about non-compliance with federal laws governing his right to due process.

68.     Dr. Doe further participated in protected activity when he complained about the school's actions and inactions to Compliance Coordinator Arong and the OIC.

69.     In retaliation for Dr. Doe's complaints, the school operated outside of normal procedure for the SEPC process and forced Dr. Doe to endure an unjustified committee process and then unrightfully issued an amendment to Dr. Doe's Medical School Performance Evaluation letter, which directly prevented him from securing a residency position.

70.     There is a causal connection between Dr. Doe's complaints about the OASA office and the materially adverse actions taken against Dr. Doe by the school. *See* para. 85, *infra.*

71.     Furthermore, the retaliation endured by Dr. Doe would dissuade and deter a reasonable medical student from making complaints of harassment and discrimination or otherwise engaging in protected activity under law.

72.     Defendant UTHSCH retaliated against Dr. Doe for engaging in protected activity in violation of federal law.

## **COUNT 3 Violation of 42 U.S.C. § 1983**

AS AGAINST ALL INDIVIDUAL DEFENDANTS:

73. Plaintiff realleges and incorporates by reference as though fully set forth paragraphs 11 through 59. In doing each and all of the acts alleged, the individual defendants were acting under color of state law.

74. The individual defendants had a duty to provide and ensure an educational environment for Dr. Doe free of sexual innuendo, intimidation, and discriminatory animus and to enforce the regulations, rules, and laws necessary to protect Dr. Doe and other male students from the acts of sexual harassment, bias and discrimination.

75. The individual defendants intentionally, willfully, and without justification deprived Dr. Doe on grounds of sex of his rights, privileges, and immunities secured him by the Constitution and the laws of the United States, in violation of 42 U.S.C. § 1983.

76.     The individual defendants intentionally, willfully, and without justification deprived Dr. Doe of his right to due process, as laid out in paragraphs 11-59, *supra*. Dr. Doe's private interest in securing a residency match was affected by the individual defendants' actions of adding a self-

serving and retaliatory addendum to Dr. Doe's MSPE letter and of failing to conduct a reasonable investigation into Dr. Doe's outcry of sexual harassment and a Title IX violation, and the risk of the deprivation of Dr. Doe's interest was great. The heavy weight and importance of the MSPE letter is commonly known in the field of medical education. The procedural requirements of following the SEPC process would not have imposed any additional fiscal or administrative burden on Defendants McNeese and Lahoti; ensuring that Dr. Doe's input was incorporated into the Title IX investigation process would not have imposed any additional fiscal or administrative burden on Defendants Moylan and Obeng.

## **COUNT 4** Breach of Contract

AS AGAINST DEFENDANT THE UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER AT HOUSTON:

77.     Plaintiff realleges all matters set forth in paragraphs 11-59 and incorporates them herein.

78.     It is generally held that the basic legal relationship between a student and a university is contractual in nature. *Guidry v. Our Lady of the Lake Nurse Anesthesia Program*, 170 So.3d 209, 213 (2015). It is also generally accepted that the "catalogs, bulletins, circulars, and regulations of the university made available to the student become part of the contract." *Shafiq v. Ochsner Health System*, C.A. 18-8666 (2019), citing *id.*

79.     Plaintiff and Defendant UTHSCH entered into a contract when Dr. Doe enrolled in the school. Plaintiff has performed his obligations under the contract. Defendant, however, has not performed its contractual obligations. Specifically, Defendant did not follow its published regulations or customary procedures regarding the SEPC process when dealing with matters pertaining to Dr. Doe.

80.     The complainant in the most recent SEPC meeting was OASA and they were also members of the committee. Dr. Doe did not get to hear witness testimony or cross examine witnesses. The SEPC meeting was held in a different part of the school, while the meetings are usually held in the OASA office. The location of the meeting was not provided to Dr. Doe until the night before the meeting, even though every other student called before SEPC knows the meeting location at least one week prior to the meeting. The OASA made the decision to deny Dr. Doe his right to have his attorney present in the room.

81.     Defendant's nonperformance is a breach of the parties' contract.

## **COUNT 5** Violation of the First Amendment to the U.S. Constitution

AS AGAINST DEFENDANT THE UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER AT HOUSTON:

82.     Plaintiff realleges all matters set forth in paragraphs 11-59 and incorporates them herein.

83.     The First Amendment to the United States Constitution, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, states that "Congress shall make no law…abridging the freedom of speech." U.S. Const. amend.1. Reporting sexual harassment and then filing internal complaints when the defendant school did not respond to those reports are examples of the most fundamental type of speech that the First Amendment protects. Dr. Doe's freedom to report and file complaints falls within the protections afforded by the First Amendment, and he is not stripped of those protections when he enters the doors of UTHSCH. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) ("It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."). United States Supreme Court precedent makes it clear that the only applicable exception to Dr. Doe's right to free speech is *Tinker*'s prohibition against speech that is materially and substantially disruptive to the educational process. There can be no reasonable argument that Dr. Doe's report of sexual harassment, Title IX complaint, or internal complaints to OIC were "lewd," "vulgar," "indecent,"

or "profane." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986).

There is no evidence that Dr. Doe's Title IX complaint or internal

complaints disrupted the educational process at UTHSCH. In fact, Dr. Doe

utilized two specific channels to seek relief that are official offices within

the school, established by the school itself. The school's own office cannot

be considered a method of disruption.

84.     Government officials may not retaliate against private citizens

because of their exercise of their First Amendment rights. Defendant's

retaliatory conduct of adding a damaging addendum to Dr. Doe's MSPE

letter, not requested or recommended by the SEPC, caused injury to Dr. Doe

by preventing him from matching with a residency in not one, but two,

medical specialties. This loss of opportunity at a critical time in Dr. Doe's

education as a physician is a level of injury that would chill a person of

ordinary firmness. Undoubtedly, this conduct by the school would cause an

average medical student to change his or her speech (i.e., choose not to

report sexual harassment or complain when their reports fall on deaf ears).

85.     The defendants themselves revealed that the adverse actions

against Dr. Doe were substantially motivated by what Dr. Doe said and did.

Defendant McNeese refused to meet with Dr. Doe, thus depriving him of

educational services to which all other students had access, <u>because</u> of the

complaints he filed against her office. Sgt. Riner warned Dr. Doe that if he continued down the path to pursue his complaints against OASA, Dr. Doe would find himself before the SEPC yet again. Sgt. Riner opined that the whole situation had become "personal" for the OASA staff defendants. Prior to the SEPC meeting in December 2019, Dr. Redwine told Dr. Doe that SEPC would not take any action because the referral to SEPC was just OASA's "perception" and not based on facts. Dr. Redwine also discouraged Dr. Doe from complaining to higher-ups and from escalating the issue because "that's part of the problem." Finally, at the December 2019 SEPC meeting, one of the committee members remarked, "I went to school here too and I didn't know who OIC was, or who Stephen was, or who William Lemaistre was, but you are on a first name basis with them. That's weird."

WHEREFORE, Plaintiff prays for relief as hereafter set forth.

### F. COMMON LAW AND STATUTORY DAMAGES

86.     Plaintiff's damages include all damages available under common and statutory law, including but not limited to, actual damages, reasonable expenses in reliance on Defendant UTHSCH's performance of the contract, lost earnings, attorney's fees, court costs, and interest.

## G.  DECLARATORY RELIEF

87.    A present and actual controversy exists between Plaintiff and Defendant UTHSCH concerning their rights and respective duties. Plaintiff contends that Defendant UTHSCH violated his rights under Title IX. Plaintiff is informed and believes, and therefore alleges, that the Defendant UTHSCH denies these allegations. Declaratory relief is therefore necessary and appropriate.

88.    Plaintiff seeks a judicial declaration of the respective rights and duties of the parties.

## H.  REQUEST FOR PRELIMINARY INJUNCTION

89.    "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). Dr. Doe meets all the prongs of this test and is entitled to preliminary injunctive relief.

90.    There is a substantial likelihood that Plaintiff will prevail on the merits. A plaintiff does not need to prove that he will ultimately prevail when seeking a Preliminary Injunction. *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2nd Cir. 1985). Here, Plaintiff Dr. Doe presents to the Court factual

allegations that permit an inference of more than the mere possibility of Defendants' misconduct and that show he is entitled to relief. *See Branham v. Dolgencorp, Inc.*, No. 6:09-cv- 00037 (W.D. Va. 2009) (slip op.; 8-24-09). The specific factual details of Plaintiff's claim demonstrate that there is a substantial likelihood that he will prevail on the merits.

91.    Plaintiff will likely suffer irreparable injury if Defendant UTHSCH is not enjoined from re-issuing Dr. Doe's Medical School Performance Evaluation letter as amended while this suit is pending. Injury to Dr. Doe is imminent because Dr. Doe is unable to secure a medical residency with the unfavorable and retaliatory addendum to the original letter. This injury is irreparable because as a result of the unfavorable MSPE letter, no residency program accepted Dr. Doe for a residency in 2020; a second issuance of the letter as it currently reads would prevent Dr. Doe from matching again. Two residency cycles without a match are fatal to a young doctor's career. This injury is not speculative because without the Injunction, injury will occur before the end of the current calendar year, before the Court rules on the merits of the case. *See RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).

92.    There is no adequate remedy at law available to Plaintiff, based on the facts as pled. *See Crane v. Indiana High Sch. Athletic Ass'n*, 975 F.2d

1315 (7th Cir. 1992) (the court properly enjoined athletic association from declaring the plaintiff ineligible to participate in a sporting event; plaintiff lacked adequate remedy at law).

93.    The harm faced by Plaintiff outweighs the harm that would be sustained by Defendants if the Preliminary Injunction were granted. Whether or not Dr. Doe is able to match for a residency is of no consequence to Defendant UTHSCH but is of utmost consequence to Dr. Doe. In order to complete his medical training, he must be able to make a residency match and without the Preliminary Injunction against Defendant UTHSCH, Dr. Doe will not be able to do so. Defendants cannot show that the entry of a Preliminary Injunction will harm them in any way.

94.    Issuance of a Preliminary Injunction would not adversely affect the public interest. Dr. Doe is not a danger to the public, as he satisfactorily completed medical school and graduated in May 2020. He met all standards and requirements for graduation and is adequately prepared to complete a residency. In fact, granting the Preliminary Injunction would be a benefit to the public interest, as in the current time of international pandemic and medical necessity, Dr. Doe's work in the medical field as a resident would benefit the public interest and have a positive impact on our community.

95.     Plaintiff is willing to post a bond in the amount the Court deems appropriate.

96.     Plaintiff asks the Court to set his Application for Preliminary Injunction for hearing at the earliest possible time and, after hearing the request, to issue a Preliminary Injunction against Defendant UTHSCH.

## I. JURY DEMAND

97.     Plaintiff demands a jury trial and tenders the appropriate fee with this Complaint.

## J. PRAYER

98.     FOR THESE REASONS, Plaintiff Dr. John Doe prays that the Court issue citation for Defendants to appear and answer, that this Court provide a trial by jury, and that Plaintiff be awarded a judgment against Defendants for the following:

       a.   economic damages;

       b.   non-economic damages;

       c.   prejudgment and postjudgment interest;

       d.   reasonable attorney's fees;

       e.   disbursements and court costs; and

       f.    all other relief to which Plaintiff is entitled and that the Court deems just and proper.

99.     Furthermore, Dr. Doe prays that the Court award damages to Dr. Doe to fully compensate him for the injuries caused by Defendants' discriminatory, harassing, and retaliatory conduct, pursuant to and within the statutory limitations of federal law.

DATED: September 14, 2020.

Respectfully Submitted,

SUSAN SOTO LAW, PLLC

By:  /s/ Susan H. Soto
Susan H. Soto
Federal ID No. 1812015
State Bar No. 24076707

P.O. Box 571
Missouri City, Texas 77459

Telephone: 832-426-2525
Facsimile: 877-231-7331
Email: Soto@SotoSchoolLaw.com

*Attorney for the Plaintiff,*
*Dr. John Doe*